UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

" AMENDED COMPLAINT"

Arthur Lamar Brown

22-CV-00688

**CIVIL RIGHTS COMPLAINT**
42 U.S.C. § 1983

Plaintiff,

[Insert full name of plaintiff/prisoner]

JURY DEMAND

YES ✓ NO _____

-against-

1 THE STATE OF NEW YORK

2 THE CITY OF NEW YORK

3 ~~CAPTAIN PAYNE~~ DEPUTY PAYNE  Individual Capacity  Official Capacity

4 CAPTAIN HORTON Individual Capacity Official Capacity

~~CAPTAIN JOHN DOE~~ Individual Capacity Official Capacity

"SEE ATTACHED PAGE 'DEFENDANTS CONT'D'" 1 of 1

Defendant(s).

[Insert full name(s) of defendant(s).  If you need additional
space, please write "see attached" and insert a separate
page with the full names of the additional defendants.  The
names listed above must be identical to those listed in Part I]

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ JUL 18 2022 ★

BROOKLYN OFFICE

I.    **Parties**:  (In item A below, place your name in the first blank and provide your present
      address and telephone number.  Do the same for additional plaintiffs, if any.)

      **A.  Name of plaintiff**  Arthur Lamar Brown

      If you are incarcerated, provide the name of the facility and address:

      Suffolk County Correctional Facility
      110 Center Drive
      Riverhead, NY 11901

      Prisoner ID Number:  768190

If you are not incarcerated, provide your current address:

N/A

Telephone Number: N/A

**B. List all defendants.** You must provide the full names of each defendant and the addresses at which each defendant may be served. The defendants listed here must match the defendants named in the caption on page 1.

Defendant No. 1

STATE OF NEW YORK
Full Name

Job Title

UNKNOWN
Address

Defendant No. 2

CITY OF NEW YORK
Full Name

Job Title

UNKNOWN
Address

Defendant No. 3

PAYNE   (First name, and badge unknown)
Full Name

Assistant, or Deputy Warden, NYC DOC
Job Title

UNKNOWN

Address

Defendant No. 4

HORTON (First name unknown)

Full Name

Captain, NYC, DOC (Badge UNKNOWN)

Job Title

UNKNOWN

Address

Defendant No. 5

JOHN DOE # 5.

Full Name

Correction Officer

Job Title

SEE ATTACHED
LIST OF DEF. CONT'D
1 of 2 - 2 of 2

UNKNOWN

Address

## II. Statement of Claim:

(State briefly and concisely, the facts of your case. Include the date(s) of the event(s) alleged as well as the location where the events occurred. Include the names of each defendant and state how each person named was involved in the event you are claiming violated your rights. You need not give any legal arguments or cite to cases or statutes. If you intend to allege a number of related claims, number and set forth each claim in a separate paragraph. You may use additional 8 ½ by 11 sheets of paper as necessary.)

Where did the events giving rise to your claim(s) occur? 50.1 New York Ave Brooklyn, ny, Brooklyn Supreme and Criminal Courts, Various NYC DOC Facilities both on and off Rikers Island.

When did the events happen? (include approximate time and date) Various dates and times between June 2016 and January 2020, will be as approximate as possible in Statement of facts, exact dates and times may be discovered.

3

* NOTE: I accident Calculated from 2016 to 2019 it was actually from 2016 to 4t or about January 2020 a total of about 43 months.

Facts: (what happened?) On or about the 6 day of June or July 2016 (exact date may be discovered) I was arrested at the apartment in which I was renting a room in at 501 New York AVE. by two male officers of the NYPD's 71st Precinct, JOHN DOE #1 and #2 (names, badges may be discovered). A legal process was then initiated against me by the STATE OF NY which was unreasonably and immorally sustained for ~SEE BELOW~ fourty three (43) months absent probable, or justifiable cause. To the best of my knowledge and belief at some point during or about the month of January 2020 (exact date may be discovered) Case, which was under indictment #05595-2016, was terminated in my favor and Sealed along with the Case Stemming from it for Bail Jumping (indictment # may be discovered). "Correction= Thirty-One (31) months"

* PLEASE DISREGARD CORRECTION IT WAS FOURTY THREE (43) MONTHS

SEE ATTACHED PAGES "FACTS CONT'D" 1 of 2 of 2

Page 1 of 50 - 50 of 50

**II.A. Injuries.** If you are claiming injuries as a result of the events you are complaining about, describe your injuries and state what medical treatment you required. Was medical treatment received?

P.T.S.D.- Insomnia, Anxiety, Trouble Staying asleep. Depression. Loss of Time, Loss of Time with my Son, Loss of Property, Loss of Opportunity, Loss of Business Infrastructure, Loss of Clientele, Loss of Reputation, Loss of Profit, Loss of Private Housing, Loss of All Worldly Possessions Loss of Identity, Loss of Independence, Accrued Debt

4

Ruin, Loss of Experiences, Loss of Property with Sentimental Value, Loss of Empathy

III.    **Relief:** State what relief you are seeking if you prevail on your complaint.

Compensatory Damages = 365, 700, 000.
Punitive Damages = 150, 000, 000.

I declare under penalty of perjury that on ⎯7/14/2022⎯, I delivered this
(date)
complaint to prison authorities at Suffolk County Corr. Fac. to be mailed to the United
(name of prison)
States District Court for the Eastern District of New York.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 7/14/2022

Arthur Lamar Brown
Signature of Plaintiff

Suffolk County Corr. Fac.
Name of Prison Facility or Address if not incarcerated

110 CENTER DRIVE,
RIVERHEAD, NY 11901

Address

768190
Prisoner ID#

rev. 12/1/2015

N/A

AO 240 (Rev. 07/10) Application to Proceed in District Court Without Prepaying Fees or Costs (Short Form)

# UNITED STATES DISTRICT COURT
## for the

|                              |       |                    |
|------------------------------|-------|--------------------|
|                              | )     |                    |
| _Plaintiff/Petitioner_       | )     | Civil Action No.   |
| v.                           | )     |                    |
|                              | )     |                    |
| _Defendant/Respondent_       | )     |                    |

## APPLICATION TO PROCEED IN DISTRICT COURT WITHOUT PREPAYING FEES OR COSTS
### (Short Form)

I am a plaintiff or petitioner in this case and declare that I am unable to pay the costs of these proceedings and that I am entitled to the relief requested.

In support of this application, I answer the following questions under penalty of perjury:

1. _If incarcerated._ I am being held at: _____
If employed there, or have an account in the institution, I have attached to this document a statement certified by the appropriate institutional officer showing all receipts, expenditures, and balances during the last six months for any institutional account in my name. I am also submitting a similar statement from any other institution where I was incarcerated during the last six months.

2. _If not incarcerated._ If I am employed, my employer's name and address are:

My gross pay or wages are:  $ _____ , and my take-home pay or wages are: $ _____ per

_(specify pay period)_ _____

3. _Other Income._ In the past 12 months, I have received income from the following sources _(check all that apply)_:

| | | |
|---|---|---|
| (a) Business, profession, or other self-employment | ☐ Yes | ☐ No |
| (b) Rent payments, interest, or dividends | ☐ Yes | ☐ No |
| (c) Pension, annuity, or life insurance payments | ☐ Yes | ☐ No |
| (d) Disability, or worker's compensation payments | ☐ Yes | ☐ No |
| (e) Gifts, or inheritances | ☐ Yes | ☐ No |
| (f) Any other sources | ☐ Yes | ☐ No |

_If you answered "Yes" to any question above, describe below or on separate pages each source of money and state the amount that you received and what you expect to receive in the future._

## DEFENDANTS CONT'D

5  C.O. JOHN DOE #5 - Individual and Official Capacity
6  C.O. JOHN DOE #6 - Individual and Official Capacity
~~7  C.O. JOHN DOE #7 - Individual and Official Capacity~~
~~8  Unknown C.O. JOHN DOES - Ind. and off. Capacity~~
9  Arresting Officer JOHN DOE #1 - Ind. and Off. Capacity
10  Arresting Officer JOHN DOE #2 - Ind. and Off Capacity
11  Various Intake C.O. JOHN DOES, OBCC - Ind. Off. Cap.
12  Various Intake C.O. JOHN DOES, AMKC - Ind. Off. Cap.
13  Adjudication Captain JANE DOE #1 - Ind. and Off. Cap.
14  Adjudication Captain JANE DOE #2 - Ind. and Off. Cap.
15  C.O. JOHN DOE #10 BUS DRIVER - Ind. and off. cap.
16  CAPTAIN JOHN DOE #1 - Ind. and Off. Capacity
17  C.O. JOHN DOE #11 - Individual and Official Capacity
18  C.O. JOHN DOE #12 - Individual and Official Capacity
19  Other Unknown JANE/JOHN DOE Adjudication
    Captains - Individual and Official Capacities.

NOTE: Numbers 7 and 8 were removed as defendants
because it is a possibility that they were kept in the
dark by Captain HORTON, it is also a very strong
possibility that two of the Unknowns were
C.O. JOHN DOE #5 and #6.

LIST OF DEF. CONT'D Page 1

DEF. No. 6     JOHN DOE # 6
              Corr. Officer

~~DEF. No. 7~~     ~~JOHN DOE # 7~~
              ~~Corr. Officer~~

~~DEF. No. 8~~     ~~Unknown JOHN DOES~~
              ~~Correction Officers~~

DEF. No. 9     JOHN DOE # 1
              Police Officer

DEF. No. 10     JOHN DOE # 2
              Police Officer

DEF. No. 11     Various Intake JOHN DOES, OBCC
              Correction Officers

DEF. No. 12     Various Intake JOHN DOES, AMKC
              Correction Officers

DEF. No. 13     & JANE DOE # 1
              Adjudication Captain

DEF. No. 14     JANE DOE # 2
              Adjudication Captain

1 of 2

DEF. No. 15    JOHN DOE # 10
Corr. Officer, Bus Driver

DEF. No. 16    CAPT. JOHN DOE # 1
Captain

DEF. No. 17    JOHN DOE # 11
Corr. Officer

DEF. No. 18    JOHN DOE # 12
Corr. Officer

DEF. No. 19    Other UNKNOWN JANE/JOHN DOE
Adjudication Captain

2 of 2

<u>FACTS CONT'D</u>

On or about the 4 day of January 2017 I was taken to OBCC on Rikers Island where myself and others were confined to an over crowded cell in the main intake area. There was not a single clean surface, the toilet was backed up with feces and urine and the cell lacked proper ventilation, and a place to sit. After a few hours elapsed a male C.O. JOHN DOE #1 came to the cell and announced that he would letting everyone out one at a time to be "finger printed". When it was my turn I was taken to a counter where Three(3) Commercial instruments being Issued For Value, offering an individual the opportunity to become an INMATE, were laid on the counter top before me, like everyone before and after mee. The presenting C.O. JOHN DOE #1 then placed an "X" to the left of the lines on the face of all three instruments, above the words "INMATE SIGNATURE", then laid the pen down and requested that I subscribe my signature on the lines next to the "X's" then ink my left index finger and affix my print, A.K.A. my SEAL, on the face of all three instruments, in the boxes labled "INMATE PRINT", to complete the "New Admissions Process". After I respectfully declined the offer to do so C.O. JOHN DOE #1 became irate and directed me back to the holding cell while threatening the use of force to gain compliance.

1 of 50

Several hours later I was placed on a van and taken to A.M.K.C. where I was again forced into an over crowded cell which reeked of urine and feces and lacked proper ventilation. I was again made the offer to complete the New Admission Process by C.O. JOHN DOE #2 and I again declined the offer. Because of this I was deprived of food, water, ( C.O. JOHN DOE #2 told the intake porter not to give me anything at feeding time) a bed to sleep in, access to medical, and access to a phone. After two (2) days of being confined under these conditions by various, JOHN DOE, C.O.'s during rotating shifts, Deputy PAYNE (badge may be discovered) ordered that I be isolated from others in or about the first pen of the main intake of AMKC and placed into a full setup namely, Shackled and Cuffed with mittens on my hands, a metal chain around my waist and a pad-lock securing my hands to said chain to deprive me of all movement and comfortability. After Several hours of being subjected to said restrained confinement I was placed onto a van around 9-10 PM and transported by Deputy PAYNE and one other C.O., JOHN DOE, to G.R.V.C. on or about the 6 or 7 day of January 2017. (date may be discovered) Upon my arrival in the main intake of GRVC it was ordered by Deputy PAYNE that I be placed into solitary confinement, I was then taken to

2 of 50

the 2-B Housing unit and placed into ~~on~~ the second
or third Cell to the right. The 2-B Housing unit
itself and all cells therein were officially "Downed"
meaning it was deemed to be a living hazard and shut
down for repairs. The cell that I was confined to
lacked running water, the plumbing was down, there
was no light bulb, or mattress, the bed frame was
rusted over, there was a thick layer of a gray/white
dust on every surface, the paint was pealing from
the ceiling and the walls, and there were dead
cock roaches, flies and spider webs. The cell also
lacked proper ventilation, or heat. (which exposed me
to the near, if not below, freezing temperatures of
January.) During or about the next evening on or about
the 7 or 8 day of January 2017, a female Deputy
Warden, JANE DOE #1, who was accompanied by a
female Captain, JANE DOE #2, (names and badges maybe
discovered) discovered that I was being housed
under said conditions and gave officers under their
command to feed me and get me out of their
building and take me back to the building that I
was supposed to be in, I was fed in the intake
and taken back to O.B.C.C.. Upon my return to
OBCC on or about the 7 or 8 day of January 2017
I was confined in the same cell that I was
previously confined to and it had not been
cleaned or sanitized since my confinement in it on

3 of 50

or about the 4 day of January 2017. After I
again declined the offer to complete the New Admission
Process when presented to me by C.O. JOHN DOE #3 I
was again deprived of food, water, (C.O. JOHN DOE #3 told
the intake porter not to feed me when the food cart arrived)
medical, Sleep, and access to a phone call. This State
of confinement and pattern of abuse was continued for
at least two (2) days, in the main intake of OBCC, by
Various, JOHN DOE, C.O's during rotating Shifts and was
upheld by their Shift Supervisors namely various
JOHN DOE and JANE DOE Captains and Deputy Wardens.
(names and badge # may be discovered)

On the first day that I was Scheduled to be
returned to court (exact date may be discovered) I was
taken from the main intake to the SEG intake at or
about 7:AM. I was again presented with the
New Admission Papers and prompted by C.O.
JOHN DOE #4 to Subscribe and affix my Seal to
the face of all three (3) instruments. After I
respectfully declined this offer I was ~~placed into~~
denied access to the court and placed into a
downed Cell, on the right side of the lower tier,
which had the window Stuck open and exposed me
to the near freezing outside temperatures. I was
left in this condition of confinement without heat
while being deprived of food, water and Sleep until
at or about 8:PM when the SEG intake closed.

4 of 50

When the SEG intake closed for the night I was placed in or about #26 Cell in the adolescent housing unit in the South Tower on, or about the second floor for the night. (exact location may be discovered) At or about 6:AM (the morning following my first scheduled court return since my confinement on the 4 day of January 2017) I was awaken when two (2) brown skinned male C.O.s, JOHN DOE #5 and #6, under the orders of a Captain HORTON (Shield # may be discovered) came into the cell pinned me to the bed and removed my shoes and sweater then exited the cell. A female Deputy Warden, RIVERA, (name may be verified, shield may be discovered) noticed Captain HORTON and C.O. JOHN DOE #5 and #6 in front of the cell on the video monitor and came to the housing unit to see why. After I informed Deputy Warden RIVERA of what had just taken place, and what had occurred the previous day, She ordered Captain HORTON to return my property, feed me breakfast, and upon my return to intake place me into a cell that was "NOT DOWN" namely one that had potable water, working plumbing, and heat. This order was followed until after the 7:AM and the 3:AM shift changes where I was again deprived of lunch and Dinner meals then, taken back to the same Cell on the same adolescent housing unit after SEG intake closed at or about 8:PM. At or about 6:AM on the following morning (exact date

5 of 50

may be discovered) while I was asleep in or about
#26 Cell on or about the Second floor of the South
Tower, OBCC, I was awaken by a loud banging
on the Cell door. When I Sat up and faced the
Cell door, without warning, or provocation, I was
blasted in the face with a harsh chemical agent
by an unknown C.O. JOHN DOE #7 acting under the
command of Captain HORTON. I was immediately
blinded and asphixiated, the Cell door was opened
and an unknown number of C.O. JOHN DOES
(names and Shield numbers may be discovered) entered
the cell grabbed me from the bed and violently
Slammed me to the Concrete floor and began
punching and Kicking me about the head, upper
and lower body. I was stripped completely naked
rear cuffed and Shackled, the chemical agent was
Sprayed on my genitals and facial areas, then I
was dragged out of the cell, down a flight of Steps
and placed into a hot Shower to open my pores
which caused an even intense burning Sensation
all over my face and body. I was then taken to the
main intake area and placed into a Single occupancy
cell known throughout OBCC as the "WHY ME PEN."
I was denied medical attention and left inside of
the cell naked in full view of the Crowded cell
directly accross from me, and I was again deprived
of food, water, a bed to Sleep in, and a phone call

6 of 50

by Various intake C.O. JOHN DOES, and JOHN DOE intake Captains during rotating Shifts.

On the day of my second Scheduled court return (exact date may be discovered), Since my confinement on the 4 day of January, I was again offered the opportunity to Subscribe my Signature and affix my seal to the New Admission Papers by intake C.O. JOHN DOE #8. After I again declined to accept this offer, for a Fifth time, for the Second time I was denied access to the Court and a Currently unknown C.O., Captain, or Deputy Warden, JOHN, or JANE DOE, again made false Statements alleging that I was refusing to appear in Court.

On the third Scheduled court return date (exact date may be discovered) the Court issued an order to produce, I was given clothes from the Clothes box (not an institutional uniform) and taken to court without being presented with the New Admission Papers (N.A.Prs.) or completing the New Admission Process (N.A.Proc.). Upon my return from Court to OBCC I spoke with two (2) JOHN DOES from Internal Affairs about the Assault and Battery by Captain HORTON and Officers under his command, and being locked in a downed cell in a downed housing area by Deputy PAYNE. I was then transfered back to AMKC where I was

7 of 50

housed in 7 UPPER without signing, sealing or delivering the N.A. Prs., or completing the N.A. Proc.

On a currently unknown date and time (which may be discovered) I was shackled, rear cuffed and carried by three (3) C.O. JOHN DOES, under orders from a Captain JANE DOE, (names and badges may be discovered) from the main intake of AMKC and placed into a steel cage onboard an awaiting bus naked but for a sheet draped over my shoulders. I was transported to VCBC in the Bronx, upon arrival into the parking lot of VCBC I was told by the bus recorder C.O. JOHN DOE #9 to exit the bus to enter VCBC. This would have meant me walking through the parking lot, up a flight of concrete steps, accross a rusted metal gang plank, and onto the barge that is VCBC while shackled, rear cuffed, barefoot and naked. When I declined to do this without being properly clothed and shoed I was left alone on the bus while the recorder, and the bus driver escorted everyone else into VCBC. About Ten (10) minutes later the bus driver, C.O. JOHN DOE #10, returned to the bus irate and alleged that I was stopping him and his partner from leaving. C.O. JOHN DOE #10 then closed every window on the bus, started the engine, turned the Air conditioner on and up to

8 of 50

maximum cool, exited the bus and closed the
door behind himself. I was left to freeze on
board the bus inside of a 4×4 steel cage while
naked, barefoot, rear cuffed and shackled for
several hours before a team came out to the bus
placed me on a gurney and took me into VCBC.
I was taken to sick bay where I was given
clothes and shoes, my vitals were taken, I was
wrapped in blankets to warm me and given water
to hydrate me. I was then taken to the main intake
where I discovered that Captain HORTON (The same
Captain who gassed, asphixiated, assaulted and battered me
that January 2017 in OBCC) was the intake Captain.
I also discovered that Deputy PAYNE (The same
Deputy who had me deprived of food, water, sleep and
placed into a full set up in the intake of AMKC, then
had me confined in a downed cell in a downed
housing unit that January 2017) was the intake
Supervisor. Between Deputy Warden PAYNE and
Captain HORTON I was denied a bed to sleep in
and was forced to sleep in the main intake on the
cold, warped, rusted metal floors of several
different filthy roach infested pens for 7-8 days
from on or about a Friday to on or about the
following Friday when I was transfered to the
Brooklyn House of Detention Center. (exact date
may be discovered)

9 of 50

Upon my arrival at Brooklyn House and receiving my property I discovered that someone had gone through my belongings and removed my Law Dictionary, English Dictionary, Postage Stamps, and the majority of my legal Papers were destroyed, or missing. My reading books and magazines were damaged, my Legal Pad had pages that contained legal notes, times, dates, C.O. Badge numbers and names, family Phone numbers and mailing addressess, ripped out. Photos of my son and other family were damaged, or missing, my Clothes were damaged, hygene products such as lotion had been intentionally poured over the rest of my property other hygene products were missing along with food items.

On a date and time in 2017 currently unknown to me, (exact date may be discovered) in Brooklyn House, while I was rear cuffed, and Shackled, I was dragged off of the elevator on, or about the 9th Floor by two (2) officers under the Command of a Captain JOHN DOE #1, C.O. JOHN DOE #11 and C.O. JOHN DOE #12. (names and badges may be discovered) I was dragged face down by the chains of the Shackles on my ankles through the elevator well onto the bridge, past the C.O. desk and to the Sally pord gate of the unit that I was being housed on. (unit and Cell may be discovered) Captain JOHN DOE #1 then entered the unit and made everyone enter the

10 of 50

the day room then locked them in, I was then
dragged up the teir. Captain JOHN DOE #1 told C.O.
JOHN DOE #11 and C.O. JOHN DOE #12 to step out of
the way, Captain JOHN DOE #1 then removed his
riot sized container of chemical agent from its
thigh holster, removed the safety pin and sprayed me
directly in the left side of my face while holding
the canister less than a foot away from my face. I was
immediately blinded and asphixiated, as I turned my
head to the right and attempted to inch away Captain
JOHN DOE #1 continued to spray me on the right side
of my face, the back of my head and neck while
standing over me. Captain JOHN DOE #1, C.O. JOHN DOE #11,
and C.O. JOHN DOE #12 then exited the housing area after
locking me on the teir and leaving me rear cuffed, shackled,
face down on the floor and unable to breath. These
Officers then concocted a story alleging that I was
uncuffed in the sally port and I threw a punch at
Captain JOHN DOE #1, missed him, he then gave me a
three second burst of chemical from five feet away, I
was then re-cuffed and locked on the teir. After I was
removed from the housing unit and taken to intake the
tan sweater that I was wearing was alleged to have
been taken for evidence because the collar, shoulders,
and back were saturated with chemical agent which
spoke to the contrary the story given by officers. The
next day I spoke with a JANE DOE #1 of IAB and a

11 of 50

JOHN DOE #3 of IAB. (names and badges may be discovered)

During the course of my Sixteen (16) month forced deprivation of liberty and enslavement within the NYC DOC I was further arbitrarily and wrongfully Subjected to forced Solitary Confinement / Punitive Segregation on at least Six (6) different OCCassions, in thirty (30) day Stints (Dates may be discovered) by Adjudication Captains Jane DOE *1, JANE DOE *2 and a Currently unknown JANE / JOHN DOE. (May be discovered).

City Policies and Customs that Denied
Constitutional Rights and Immunities
while acting Under Color of State Law

1. Warrantless Arrest Policy and or Custom

The City of New Yorks Policy and or
Custom to perpetrate Warrantless Arrests acted
in Contravention to my inalienable rights and
immunities Secured by the 4th and 14th Amendments
to the Constitution. It was Known, or should have been
Known, at the time that this policy and or Custom was
enacted that it could, and would, be abused, that
given the choice between acquiring a lawful warrant,
or perpetrating a warrantless arrest, in a given
Situation the officer would favor a warrantless
arrest, especially when the Situation involves a man
of color such as myself. This is evidenced by the
fact that more then 75% of arrests made by the
NYPD are warrantless and the majority of these
arrests are of men of color. In this case there
existed neither a dire Situation, nor exigent
Circumstance, that gave officers a reasonable cause
to neglect their sworn duty, and obligation, to
protect the Constititution in favor of this faulty
Policy, and or Custom, to perform a warrantless
arrest. In that, I was in the apartment which

13 of 50

I was renting a room from family between the early morning hours of 6 and 7 AM. The 71st Precinct is one block away and its officers routinely, up to 3 times per day, come to the building to check the stair ways and roof, and are familiar & with the entire layout of the building. Officers are also aware of the layout of a dozen cameras on the premises, especially in the area where the alleged incident was said to have occurred, and that they all work and record on a digital platform. Also, I provided valid identification that matched the address to the apartment that I was in, (6D) there were no warrants for my arrest, the alleged incident was said to have taken place only about twenty (20) minutes prior, and the allegation barely amounted to a Misdemeanor. The City has enacted this faulty policy and or custom and has negligently permitted the NYPD to adopt a practiced pattern of improper use thereof, and has failed to create and/or maintain a proper system for oversight of its officers misconduct prior to the deprivation of my rights and immunities secured by the Constitution. Therefore, the City of New York is wholly liable to me for all damages, lossess, injuries, pain and suffering that I have endured as a result of its gross negligence in this matter.

Lastly, the City Policy makers knew or should have

14 of 50

or should have Known, at the time that this policy and or custom was enacted, even if done out of good faith, that the slightest abuse thereof would Subject Citizens to be the victims of false arrests, and imprisonments thereby, denying to them the most fundamental rights secured by the Constitution namely Due Process, Equal Protection of the Law, Liberty, and the pursuit of happiness.

2.   Confinement to the NYC DOC Custom and or Policy.

a).   The City of New Yorks long standing Policy and, or Custom to Confine Citizens alleged to have offended a Statute within the NYC DOC exists in contravention to the rights and immunities Secured by the 13th Amendment to the Constitution namely "No Slavery, or involuntary Servitude, except as punishment for Crime whereof the party shall have been duly Convicted". Slavery is lawfully defined as "A Situation in which a person has absolute power over the life, liberty, and fortune of another, the practice of Keeping individuals in this state of bondage". It was Known, or should have been Known, at the time that this policy and or custom was enacted that Citizens would deliberately be made the victims of this faulty policy and or custom thereby denying them the rights and immunities

15 of 50

2. Confinement, to the NYC DOC, Policy and, or Custom

Secured by the 13th Amendment. The NYC DOC may not be a "Person", or a "Suable entity", nevertheless, if is (as acknowledged by the Court) an of agency of the City of New York which exists through its policies and or customs. The Sole purpose for which the NYC DOC exists is to keep individuals in a state of bondage While exercising absolute power over their lives, liberty, and fortunes, a practice which pre dates my Sixteen (16) month confinement by decades.

b). Slavery itself is inhumane in nature and therefore meets the definition of "Cruel and Unusual" the framers of the Constitution had in mind when they drafted it. The framers also understood the long term effects of the psychological damages caused by any period of confinement (which is forced) in this peculiar institution more then a century before PTSD was diagnosed and or accepted as a mental illness. This is the reason why they reserved Slavery only for those who have been duly convicted of heinous crimes because they are then seen to be Suffering from a mental illness and an in-ability to function properly in Society. The Cities Policy and or Custom makers knew or should have known at the time that this faulty policy and or custom was enacted that to enforce it would subject citizens not duly convicted to be the victims of Cruel and Unusual Punishments inflicted upon them as a result, thereby

16 of 50

denying them those rights and immunities secured by the 8th Amendment.

C). The Cities faulty Policy and or Custom to confine the accused within the NYC DOC further denied me my inalienable rights and immunities secured by the 14th Amendment. It was known or should have been known at the time that this policy and or Custom was enacted that it would cause citizens to be unconstitutionally deprived of their right to liberty absent Due Process of the Law, there by, also denying them Equal Protection of the Law.

My Sixteen (16) months of forced confinement within the NYC DOC under this faulty policy and or Custom denied me these fundamental inalienable rights and immunities secured by the Constitution. Therefore, the City of New York is wholly liable to me for all of the damages, lossess, pain and Suffering that I endured as a result of my being denied Due Process, and Equal Protection of the Law, and Subjected to Cruel and Unusual Punishments inflicted while being deprived of my liberty, and held in Slavery.

3. Forced Admission Policy and or Custom

The City of NYs Policy and or Custom ~~must complete the~~ that every individual who is

17 of 50

Confined within the NYC, DOC must complete the "New Admission Process", in combination with its Force Policy and or Custom, its failure to properly train and or inform its employees of what the New Admission Process actually Creates and achieves, and the rights of individuals to decline this process, and its failure to maintain a proper system for oversight of its employees whos duties it is to make the presentment of the "New Admission Papers" and or facilitate the New Admission Process Caused me to repeatedely be the victim of physical, mental, emotional, and psychological abuse. Thereby denying me the rights and immunities secured by the 8th Amendment namely "No Cruel and Unusual Punishments inflicted". In that, Out of necessity the NYC DOC requires all individuals it intends to confine within its facilities, for any period of time, to complete whats Known as the "New Admission Process".

Admission = "An act of a Corporation by which an individual acquires the rights and duties of a member (namely an INMATE) of the Corporation".

Process = "A manner of doing which creates and or Achieves some Thing".

The act of the Corporation is when the agent officers thereof "Issued For Value" the

18 of 50

three (3) Commercial instruments refered to as the New Admission Papers and requested that the individual Subscribes his/her Signature on the face of all three instruments, on the lines directly above the words "INMATE SIGNATURE", then to affix his/her seal (left index finger print) to the face of all three instruments, in the boxes labled "INMATE PRINT", to complete the New Admission Process. (Once complete the new INMATE is issued an INMATE HANDBOOK and INMATE RULE BOOK So that he/she may know their RIGHTS and DUTIES) This process serves to create an "Instrument Under seal", and the NYC DOC achieves its goal to acquire an interest, and invoke the protections of Article I, Section X Contract Clause "No State shall abridge the obligations of a Contract". This language makes it clear that;

① By law an individual is not seen to be held in Slavery, or go against his own will if he/she uses their unlimited ability to contract themselves into Such peculiar institutions.

② Any pain and suffering arising from an administrative penalty for breach of contract is seen by law to be inherent in and incidental to a lawful sanction and therefore does not amount to Cruel and Unusual Punishment.

19 of 50

Corporate Counsel would have informed Policy Makers
of this legal maneuver, and forewarned them of
any potential legal consequences of their actions.
Therefore, the Cities Policy Makers Knew or should
have Known at the time that this faulty Policy and or
Custom was enacted and its employees were given the
directive to enforce it without informing them, or causing
them to be informed of the "Essential Facts", namely,
① The New Admission Process is an act of the NYC
DOC intended to acquire a legal interest in each
individuals person for the purpose of enforcing its
Policies through Administrative Penalties for breach of
its Rules of Conduct.
② An individual is not an INMATE until he/she
signs, seals, and delivers the New Admission Papers,
to an agent officer, free from all forms of duress.
③ It is the individuals right to decline the
offer of the New Admission Papers without fear of
being subjected to any form of abuse.
that it would ultimately lead to its employees use
of un-necessary and or excessive force, and other
forms of abuse, to intimidate, coerce and compel
individuals to complete the New Admission Process.
Thereby denying them the rights and immunities
secured by the 8th Amendment, namely, "No Cruel
and Unusual Punishments inflicted".
        Under the Cities Force Policy and or Custom

20 of 50

" An employee is authorized in the use of force to; ① gain, or maintain Compliance of an INMATE, or ② to stop an INMATE from injuring him/herself, another INMATE, or an employee of the NYC DOC." Under the Disobeying a Direct Order Policy currently being enforced it states " An INMATE shall not refuse to Comply with the Intake Procedure." (There is not one employee of the NYC DOC who is aware that the "Intake Procedure" and the "Admissions Process" are NOT the Same Thing) These two Policies and or customs along with the Cities gross negligence in properly informing its employees of the afore mentioned "Essential Facts" ensured that the abuses that I suffered were inevitable long before infliction upon me. In the absense of full disclosure an officer of the NYC DOC is left with only his base programming to rely on in a given situation;

① An Officer is duty bound to follow all directives and enforce all NYC DOC policies, and or customs, on INMATES.

② An Officer is authorized to use force to gain, or maintain, Compliance of an INMATE.

③ All persons in the custody of the NYC DOC. are INMATES.

NOTE: After the "N.A.P." is Complete the new INMATE is removed to a predetermined are to undergo the "Intake Procedure" which Which involves removing all valuable property and other items from the person to be vouchered, Stripping naked, Clearing the magnometer, receiving institutional uniform, being cleared by medical, etc...

21 of 50

The Cities first act of negligence is when it failed to properly train and or inform its employees, or ensure that they were properly traned and informed of the "Essential facts" in regards to its "Forced Admissions policy and or custom." Secondly, the City negligently failed to take due precautions to prevent the abuse that was inflicted upon me by its employees even though it is clear that Policy Makers Knew or should have Known that such abuse was inevitable when they first enacted this faulty set of policies and or customs. Third, the City negligently failed to create and or maintain a proper system for over Sight of its officers to ensure that they dont resort to the infliction of Cruel and Unusual Punishments and or treatment to intimidate, coerce, and compel individuals to Sign, seal, and deliver the "New Admission Papers", to complete the "New Admissions Process." In any case, the abuse that I suffered could have been prevented by
① the City taking steps to ensure the proper education of its officers ~~admi~~ who present the Admission Papers for consideration.
② by Staffing the intake areas in its facilities where the New Admission Papers are presented with Someone from Corporate Counsel to ensure that officers involved with the facilitation of the

facilitation of the New Admissions Process do not encroach upon the rights of individuals, or ③ having someone from Corporate Counsel be the one making the presentment instead of an Officer who has no educational background in matters of Contract, or Constitutional law.

4. Use of Force Policy and or Custom

The Cities Use of Force Policy and or Custom exists to act in contravention to the rights and immunities secured by the 8th Amendment to the Constitution in that it authorizes its employees to Assault, Batter and inflict pain and Suffering on those within and without their custody to gain or maintain Compliance. It was known or should have been known at the time that this faulty policy and or Custom was enacted that it could and would be perverted and or abused by officers either seeking to use it as a license to inflict pain and Suffering, or to intimidate, Coerce and compel individuals to do Something he/she is under no lawful obligation to do, especially when the officer is under the false presumption that he/she is. A few perfect examples of this Policy and or Custom being perverted and abused is when on or about January 4 2017, after I respectfully declined to

23 of 50

Sign, Seal and deliver the New Admission Papers I was deprived of food, water and Sleep and I was isolated under inhumane conditions to intimidate Compel and Coerce me into doing so. This abuse was the direct result of the perversion of the Cities Force Policy, and or Custom, which authorizes the use of force to gain Compliance. A Second example: is when Captain HORTON ordered officers under his command to enter the Cell while I was sleep and forcefully remove my clothes from my body. Captain HORTON then falsely alleged that I resused to Comply with an order to exit the Cell. A Third example: is when Captain HORTON and officers under his command woke me up at or about 6:AM by banging on the Cell door then gassed and asphixiated me with a Chemical agent, assaulted and battered me, then generated a false report alleging that Necessary Force was used after I refused to Comply with orders to exit the Cell. A Fourth example: is when Captain JOHN DOE #1 gassed and asphixiated me with a Chemical agent while I was laying on the floor rear cuffeed and Shackled posing no threat, then generated a false report alleging Necessary Force was used after I took a Swing at him. A Fifth example: In or about 2015 I went to Rikers Island to retrieve my property from the Perry Building. I was falsely detained, arrested, and imprisoned after

24 of 50

being assaulted and battered twice on multiple
Cameras, both inside and outside of said building, in
front of dozens of Civillian and C.O. witnessess by a
C.O. Brennan. C.O. Brennan then generaled a false
report alleging that I Smelled Strongly of alcohol
and was slurring my words, and that I refused to
Comply with the Search procedures to gain access
to the facility to visit. It was then falsely Stated
that I became belligerent and refused to Comply
when directed to exit the building, I then assaulted him
(C.O. Brennan) C.O. Brennan then Stated that thats when
he used Necessary Force to Subdue me. I was arrested
and Charged with assault in the Second Degree on an
Officer, which was dropped to a Misdemeanor assault
after video footage mysteriously disappeared. I was
Subsequently acquitted at trial because C.O. JOHN DOE
who I was Speaking to when C.O. Brennan came up
behind me and pushed me to the ground testified on
my behalf and to the Contrary every thing C.O. Brennan
Stated in his report. A Sixth example of this policy
and or Custom being perverted and abused is on
the 13 day of May 2019 in the main intake of MDC
(THE TOMBS) while I was rear cuffed and Shackled.
at the directive of a Captain JOHN DOE my face was
Slammed down on the counter, I was assaulted and
battered by multiple C.O. JOHN DOES, my left hand was
pried open, my left index finger inked and my Seat was

25 of 50

affixed to the face of the three (3) New Admission
Papers. A report was then generated alleging that
INMATE: DOE, JOHN/BROWN, ARTHUR refused to
comply with the Admission Process therefore
Force was utilized to affix his needed print to
the Admission Papers.

It is no mere coincidence that each time
I was assaulted, battered, or subjected to inhumane
treatment, due to this faulty policy and or custom,
that the perpetrating officer generated and filed
a report alleging Necessary Force, it is by design.
Not only did policy makers know or should have known
at the time that this faulty policy was enacted that
it could and would be abused, and or perverted, policy
makers knowingly enabled this the abuse and
perversion of said policy by also enacting and
enforcing a policy and or custom that an incident
report and accusatory instrument be generated
alleging Necessary Force to shield the City from any
liability from injuries claimed. Corporate Counsel would
have informed policy makers of this legal maneuver
to give Counsel a leg to stand on in Court while
creating the legal presumption of Necessary Force,
which the plaintiff would have to overcome to
prevail.

Plausibly there is no amount of proper
training or oversight that would stop an officer

26 of 50

from abusing and or perverting this faulty policy for a dozen different reasons faced with a given situation, especially when the officer also enjoys the benefit of controlling the narrative. Lastly, the City of New York has enacted this faulty policy and has negligently permitted the NYC DOC to adopt a practiced pattern of improper use throughout the decades since its enactment and has failed to create and or maintain a proper System for oversight of misconduct which ultimately was the cause of me being denied the rights and immunities Secured by the 8th Amendment to the Constitution. Therefore, for these reasons the City of New York is wholly liable to me for all of the pain and Suffering inflicted, and endured, and all of the irrepairable mental, emotional, and psychological injuries and damages Caused due to the enactment, enforcement, abuse, and perversion of this faulty policy.

5.   Solitary Confinement / Punitive Segregation Policy and or Custom

The City of New Yorks Solitary Confinement / Punitive Segregation Policy exists and acted in contravention to my inalienable rights and immunities Secured by the 8th Amendment to the Constitution ("No Cruel and Unusual Punishments Inflicted")

Except that where the Contract Clause of Article-I, Section-X of the Constitution has been duly invoked ("No State Shall abridge the Obligations of a Contract") Whereupon the individual has been issued, signs, seals and delivers the New Admission Papers, to complete the New Admission Process, he/she is seen by law to have waived the rights and immunities secured by the 8th Amendment. The law then regards any mental or physical pain and Suffering arising from Subjection to Solitary Confinement/Punitive Segregation for "Breach" as being "Inherent in, or Incidental to, a Lawful Sanction" and the Court can not allow a suit for damages/injuries. Corporate Counsel would have informed Policy Makers of this legal loop hole, therefore, it was Known, or Should have been Known, at the time that Policy Makers enacted the Policy and or Custom making it a necessity for all individuals being held by the NYC DOC to be issued the N.A. Papers and complete the N.A. Process, then directed its employees to enforce these Policies and or Customs, by any means necessary, that this state of Confinement is inhumane and thus Constituted Cruel and Unusual Punishment. It is no mere coincidence that one policy and or Custom exists to deny the rights and immunities secured by the 8th Amendment and that the other forces individuals who are ignorant in such matters

28 of 80

to unwittingly and or unwillingly waive their rights
and immunities that are secured by the 8th Amendment
So that the City of New York Can not be held Civilly
and or Criminally liable for the denial of Said rights and
immunities. It was Known, or should have been Known,
at the time that this faulty policy was enacted that
individuals Could and would be arbitrarily and
wrongfully Subjected to forced Solitary Confinement/
Pun. Seg. if officers were not informed of the
"Essential Facts" namely;
1. An individual is not an INMATE until after
he/she Signs, Seals, and delivers the New Admission
Papers free from all forms of duress,
2. The Administrative Hearing Known throughout
the NYC DOC as a "Bing Hearing" exists only to
determine whether a breach of an INMATE RULE
occurred and if So to punish the offending
INMATE,
3. If an individual did not Sign, Seal, and
deliver the New Admission Papers, or did so under
duress, then he/she is not legally, lawfully, or
Constitutionally Subject to the Administrative
Jurisdiction of the Bing Hearing, or any penalty
imposed therefrom.
Absent this Knowledge in all of Six (6) Situations,
Six out of Six times, Various Adjudication Captains have
arbitrarily and wrongfully Subjected me to forced

29 of 50

Solitary Confinement/Punitive Segregation when they
either knew, or should have known, my exempt status.
Due to this faulty policy and the Cities gross
negligence in properly informing its employees, or
causing them to be informed of the afore mentioned
"Essentia Facts", I was arbitrarily and wrongfully
subjected to 180 days of forced Solitary
Confinement/Punitive Segregation. This denied me
my rights and immunities Secured by the 8th Amendment
because "I did NOT Sign, Seal, and deliver the New
Admission Papers, or complete the New Admission Process."
This denial of my inalienable rights and immunities
Secured by the 8th Amendment and all of my pain
and Suffering could have been avoided had the Cities
Policy Makers took due precautions against it by
Creating and or maintaining a system of oversight
before I became one of many victims of this long
Standing faulty policy either by;
1.  Having Someone from Corporate Counsel sitting in
    on these Bing Hearings to properly advise Adjudication
    Captains.
2.  By having Someone from Corporate Counsel
    conduct these hearings to avoid individuals being
    arbitrarily subjected to forced Sol. Con./Pun. Seg.,
3.  Or by properly informing its employees, or causing
    them to be properly informed of the afore mentioned
    "Essential Facts".

30 of 50

The City of New York is wholly liable to me for all of the irrepairable mental, emotional, and psychological injuries caused by my being arbitrarily and wrongfully Subjected to forced Sol. Con./Pun. Seg. for 180 days due to its faulty policy and or Custom, and its negligence in properly training and informing its employees.

City of NY (NYC DOC) Employees who Denied my Rights and Immunities Secured by the Constitution while Acting Under Color of State Law. (Official and Individual Capacities)

1. Deputy PAYNE: 8th Amendment Cruel and Unusual Punishment, I.I. of Emotional Distress, Negligence, Gross Negligence, Trespass, Oppression, Abuse of Power

While acting in his Official Capacity, Deputy PAYNE maliciously Subjected me, and Caused me to be the Subject, to deprivation of food, water, and Sleep in an effort to Coerce and Compel me to Sign, Seal, and deliver the New Admission Papers in accordance with NYC DOC Policy. When this tactic failed, Deputy PAYNE had me isolated, placed into Shackles, Cuffs and mittens with a Chain padlocked around my waist and wrists for several hours to cause me to be deprived of the liberty to move, and to cause me as much discomfort and

31 of 50

emotional distress as possible. When this tactic also failed to coerce and compel my acceptance Deputy PAYNE had me isolated in the most onerous condition of confinement at his disposal namely a downed Solitary Confinement housing unit, in a downed cell with no mattress, heat, or plumbing. Deputy PAYNE subjected me to further Cruelty, inhumane treatment, and punishments when he and Captain HORTON refused to assign me a bed and housing unit in V.C.B.C and forced me to sleep on the cold, warped, rusted metal floor in the intake for an entire week before having me transferred to another facility. Deputy PAYNES' actions were malicious in nature they caused me to be oppressed, placed me in a heightened state of emotional distress, and Trespassed upon my inalienable rights and immunities secured by the 8th Amendment. Deputy PAYNE negligently failed to show due compassion for my humanity and exercise due care for the State of my mental health and hygene while I was in his custody and care. As a living breathing flesh and blood man Deputy PAYNE knew or should have known that his actions were Cruel, inhumane and would cause me lasting irrepairable psychological injuries. Deputy PAYNE was given power over my life, liberty, and fortune and he willfully abused that power therefore Deputy PAYNE is wholly liable to me for damages.

32 of 50

2.   Captain HORTON: 8th Amendment Cruel and
     Unusual Punishment, 14th Deprivation of Property,
     I. I. of Emotional Distress, Abuse of Power,
     Negligence, Gross Negligence, Assault, Battery,
     Tresspass, Oppression, Aggravated Harassment,
     Asphixiation with a Gaseous Liquid/Chemical,
     Excessive Force, Unnecessary Force.

While acting in his official capacity Captain
HORTON maliciously caused me to be assaulted,
battered and Stripped of my clothing in an early
morning blitz, while I was asleep, to punish me for
declining to Sign, Seal, and deliver the New Admission
Papers, and to intimidate, coerce and compel me to
do so. This attack placed me in a heightened state
of alarm, emotional distress, fear for my well being
and heightened my levels of anxiety. When his first
efforts were not successful in compeling my acceptance
Captain HORTON caused me to be abruptly Jarred out
of my sleep, assaulted, blinded and asphixiated
with a harsh chemical gaseous agent, blitzed,
physically assaulted and battered, Stripped
completely naked, and further assaulted with said
Chemical agent directly on my genital and facial
areas. I was then intentionally forced into a hot
Shower to open my pores up causing the Chemical
agent to enter and ignite a more excruciating
burning all over my body, which lasted for days,

                    33 of 50

I was then placed naked on display in the "WHY ME PEN", in the main intake of O.B.C.C. This malicious, premeditated act of cruelty perpetrated against me caused me to suffer severe pain while placing me in a heightened state of alarm, agitation, fear for my life, and under extreme emotional distress, it was oppressive in nature and trespassed upon my inalienable fundamental rights and immunities secured by the 8th Amendment. Captain HORTON subjected me to further cruelty, inhumane treatment and punishments when he and Deputy PAYNE refused to assign me a bed and housing unit in V.C.B.C. and forced me to sleep on the cold, warped, rusted metal floor in the intake area for an entire week before having me transferred to another facility. Captain HORTON negligently failed to observe due caution and show due compassion for my humanity, or exercise due care for the state of my mental health and hygiene while I was in his care and custody. As a result of this more then five (5) years later I still suffer from insomnia, trouble falling asleep and staying asleep, and anxiety caused from the paranoid thoughts that someones going to do something to me in my sleep. Captain HORTON knew, or should have known, that his actions were cruel, inhumane and could cause me irrepairable psychological injuries. Captain HORTON was given power over my life, liberty, and fortune and

34 of 50

he willfully abused that power using it to cause me a Constitutional deprivation, therefore Captain HORTON is wholly liable to me for damages.

3. Arresting Officer JOHN DOE #1: 4th Amendment Warrantless Seizure, 8th Amend. Cruel Unusual Punishment, 13th Amend. Forced Confinement absent Conviction, 14th Amend. Deprivation of Liberty, Dep. of Property, Due Process violations, I. I. of Emotional Distress, Trespass, Oppression, Negligence, Gross Negligence, Humiliation in Public.

While acting in his official Capacity Arresting Officer JOHN DOE #1 falsely arrested, and imprisoned, me absent the existence of a lawful warrant. I was rear cuffed and paraded, against my will, into a police cruiser in front of the neighborhood and taken to the 71st Precinct where I was subjected to forced deprivation of liberty under the Cities Policy and or Custom to Process individuals after performing a warrantless arrest, which was also perpetrated under City Policy and or Customs. This warrantless Seizure and forced deprivation of my liberty caused me to be in a heightened State of alarm, emotional distress, and caused me to be humiliated in public. It oppressed me and trespassed upon my fundamentaly inalienable rights and immunities

25 of 50

Secured by the 4th, 8th, 13th and 14th Amendments to the Constitution which Arresting Officer JOHN DOE #1 is duty bound and obligated to first and foremost. There is no Clause in the Oath, or affirmation, that Arresting Officer JOHN DOE #1 took prior to Subscribing to Office as a Policy enforcement agent that granted him cause to neglect his antecedent Obligations. Arresting Officer JOHN DOE #1 negligently failed to exercise due care and observe his duty and Obligation to protect my interests, namely, my fundamentaly inalienable rights and immunities that are NOT given by the Constitution, but are Secured by it, and thus caused me to Suffer injury. Arresting Officer JOHN DOE #1 voluntarily Swore an Oath of Office and therefore knew, or should have known, at the time that his actions Constituted a deprivation of Constitutional rights and immunities on his part, therefore, Arresting Officer JOHN DOE #1 is wholly liable to me for damages.

4. Arresting Officer JOHN DOE #2:

NOTE: Claims against Arresting Officer JOHN DOE #2 are identical and verbatim to Claims against Arresting Officer JOHN DOE #1.

26 of 50

5.   Adjudication Captain JANE DOE #1 : 8th
     Amendment Cruelty, 14th Amendment Deprivation
     of liberty and Due Process violations, Oppression,
     Trespass, I. I. of Emotional Distress, Negligence,
     Gross Negligence, False Imprisonment, Forced
     Confinement.

While acting in her official Capacity Adjudication
Captain JANE DOE #1 (A.C.J.D.#1) arbitrarily, and
wrongfully Subjected me to the onerous conditions of
forced Punitive Segregation under the Cities Solitary
Confinement Policy and/or Custom. This condition of
involuntary Confinement Subjected me to the
inhumanity of Sensory deprivation and deprivation of
meaningful human contact for a prolonged period
which Caused me to be in a Constant State of
emotional distress which heightened my levels of anxiety.
This combined with the insomnia I was already
afflicted with due to prior abuse left me in a
Constant State of depression. A.C.J.D.#1 ignored
all reasoning and logic and refused to acknowledge the
truth when Confronted with absolute proof that
rebutted all false legal and administrative presumptions
that I was an INMATE and thereby Subject to
Administrative Penalties for an alleged breach of an
INMATE RULE. A.C.J.D.#1 turned the tape recorder
off and refused to allow me to make a verbal record

37 of 50

So that it could not be later used to deny a plausible deniability defense, on her part, as to whether, or not, she understood that she was Knowingly wrongfully subjecting me to Punitive Seg. in Solitary Confinement for breach of a duty that I did not owe. To the best of my knowledge, and beliefe, A.C.J.D.#1 willfully Subjected me to Pun. Seg. / Sol. Con. to maintain the illusion that I was an INMATE Subject to Administrative Penalties while relying on Corporate Immunity to Shield her from liability in her individual capacity. A. C. JANE DOE #1 actions were in bad faith, malicious in nature and caused me to be needlessly Subjected to Cruel and Unusual Punishments of Solitary Confinement / Punitive Segregation in Contravention to my fundamentaly inalienable rights and immunities Secured by the 8th and 14th Amendments namely No Cruel and Unusual Punishments inflicted, Deprivation of Liberty absent Due Process, Due Process violations. A.C. JANE DOE #1 freely Swore an Oath of Office and there fore Knew, or should have Known, that her actions, in Spite of her reasons, would cause me to be denied a Constitutional right and immunity. A. C. JANE DOE #1 negligently failed to exercise due care and observe her duty to not only protect my interests but to also restrain herself from causing me any undue pain and Suffering while I was in her Care and custody.

38 of 50

Adjudication Captain JANE DOE #1 was given power over my life, liberty, and fortune and She chose to negligently abuse that power in bad faith which caused me to be injured and She is therefore wholly liable to me for damages.

6. Adjudication Captain JANE DOE #2:

NOTE: Claims against Adjudication Captain JANE DOE #2 are identical and verbatim to Claims against Adjudication Captain JANE DOE #1.

7. Other Unknown JANE/JOHN DOE Adjudication Captains:

NOTE: Claims against Other Unknown JANE/JOHN DOE Adjudication Captains are identical and verbatim to Claims against Adjudication Captain JANE DOE #1 and #2.

8. Correction Officer JOHN DOE #10: 8th Amend. Cruel and Unusual Punishment, I.I. of Emotional Distress, Trespass, Oppression, Negligence, Gross Negligence, Abuse of Power

🦅 Correction Officer JOHN DOE #10, while acting in his official capacity, willfully exposed me to near

39 of 50

freezing temperatures for a prolonged period of time while I was rear cuffed, Shackled, naked and locked in a Steel cage on board his bus. C.O. JOHN DOE #10 actions were perpetrated in bad faith, with a malicious intent, and caused me undue pain and Suffering which placed me in a heightened State of alarm, agitation, emotional distress, and fear for my well being. C.O. JOHN DOE #10 negligently failed to exercise due care and observe his duty to protect my interests, namely my fundamental, inalienable rights and immunities Secured by the 8th Amendment, and to restrain himself from causing me any undue pain and Suffering while I was in his care and custody. C.O. JOHN DOE #10 knew, or should have known at the time, that his actions, in spite of his reason, would cause me to be deprived of a Constitutional right and immunity. C.O. JOHN DOE #10 was given power over my life, liberty, and fortune and negligently chose to abuse that power to oppress me and trespass upon my inalienable rights and immunities causing me to be injured, therefore, C.O. JOHN DOE #10 is wholly liable to me for damages.

9.   Captain JOHN DOE #1 : 8th Amendment Cruel and Unusual Punishment, I. I. of Emotional Distress, Trespass, Oppression, Negligence, Gross Negligence, Assault, Battery, Excessive Force, Unnecessary Force,

Abuse of Power.

While acting in his official Capacity Captain JOHN DOE #1 willfully assaulted, battered, blinded, and asphixiated me with a harsh chemical gaseous agent while I was rear cuffed, shackled, and laying on the floor posing no threats to anyone. This sheer act of violence perpetrated upon me was wholly unnecessary and far surpassed excessive force to constitute Cruel and Unusual Punishment. Captain JOHN DOE #1 actions were perpetrated against me with a malicious intent to cause me to suffer injury, in that, The City requires certification for usage of the riot size Cannister of chemical agent and trains employees in the appropriate distance, amount, and situation of usage. Captain JOHN DOE #1 chose to neglect that training when he stood over me and discharged the chemical agent just inches away from my face for an amount of time that greatly exceeded a five (5) second burst, while I was rear cuffed, shackled, and laying on the floor posing no threat to anyone. Captain JOHN DOE #1 actions were unjustified, in bad faith, and caused me undue pain and suffering, and placed me in a heightened state of alarm, agitation, emotional distress, and fear for my life. Captain JOHN DOE #1 knew, or should have known at the time, that his actions could have caused my untimely death, and would cause me to be denied a

41 of 50

fundamentaly inalienable right and immunity secured by the 8th Amendment. Captain JOHN DOE #1 negligently failed to exercise due care and observe his duty to protect my interests, and restrain himself from causing me any undue pain and suffering while I was in his care and custody. Captain JOHN DOE #1 was given power over my life, liberty, and fortune and he chose to abuse that power to oppress me and trespass upon my inalienable rights and immunities causing me to be injured therefore Captain JOHN DOE #1 is wholly liable to me for damages.

10.  Correction Officer JOHN DOE #5: 8th Amendment, I.I. of Emotional Distress, Trespass, Oppression, Negligence, Gross Negligence, Assault, Battery, 14th Amendment-Deprivation of Property, Unnecessary Force, Aggravated Harassment

While acting in his official capacity C.O. JOHN DOE #5 willfully placed me in a heightened state of alarm, agitation, emotional distress, fear of being gang raped, and fear for my life when he, acting in concert with C.O. JOHN DOE #6, at the instigation of Captain HORTON, entered the cell without warning while I was asleep, pinned me face down to the bed, punched me about the upper body, arms and legs and forcefully removed my sweater and shoes from my body. C.O. JOHN

42 of 80

DOE # 5 Knew, or should have known at the time, that Captain HORTON was giving him an unlawful order that did not conform to Administrative Procedure, or moral standards, and would cause me to be denied the fundamentaly inalienable rights and immunities secured by the 8th and 14th Amendments. C.O. JOHN DOE # 5 negligently failed to exercise due care and observe his duty to restrain himself, or another, from doing any thing to me that would cause me any undue pain and suffering while I was in his care and custody. C.O. JOHN DOE # 5 actions were oppressive, malicious in nature and trespassed upon those inalienable rights and immunities that he swore an Oath, or Affirmation, to protect, therefore, he is wholly liable to me for damages.

11. Correction Officer JOHN DOE # 6:

NOTE: Claims against C.O. JOHN DOE # 6 are identical and verbatim to Claims against C.O. JOHN DOE # 5.

12. Correction Officer JOHN DOE # 11: 8th Amendment - Cruel and Unusual Punishment, I. I. of Emotional Distress, Trespass, Negligence, Gross Negligence, Excessive Force, Unnecessary Force, Oppression, Aggravated Harassment

43 of 50

While acting in his official Capacity C.O. JOHN DOE #11, While acting in concert with C.O. JOHN DOE #12, dragged me over One Hundred Feet by the Chain of the Shackles around my ankles, while I was face down and rear cuffed. This placed me in a heightened State of agitation, alarm, and emotional distress. C.O. JOHN DOE #11 Knew, or Should have Known, at the time that his actions would cause me undue pain and Suffering in that, employees are routinely advised on how to properly transport a non-ambulatory individual to prevent Such inhumane and degrading treatment. C.O. JOHN DOE #11 Chose to neglect his training. C.O. JOHN DOE #11 negligently failed to exercise due care and observe his duty to restrain himself, or another, from doing any Thing to Cause me undue pain and Suffering while in his Care and Custody. His actions were Oppressive, malicious in nature, and trespassed upon my fundamentally inalienable rights and immunities Secured by the 8th Amendment, therefore C.O. JOHN DOE #11 is wholly liable to me for damages.

13.  Correction Officer JOHN DOE #12:
     NOTE: Claims against C.O. JOHN DOE #12 are
     identical and verbatim to Claims against
     C.O. JOHN DOE #11.

44 of 50

14. Various C.O. JOHN DOES' OBCC Intake: 8th
Amendment Cruel and Unusual Punishments.
Inflicted, I.I. of Emotional Distress, Oppression,
Negligence, Gross Negligence, Trespass

While acting in their official Capacities various
C.O.s JOHN DOE of O.B.C.C, Main and SEG Intakes,
willfully deprived me of food, water, a bed to sleep in,
meaningful familial contact, and caused me to be
exposed, and or allowed the prolonged exposure to the
freezing temperatures of January while I was being
confine forcefully confined to a steel and concrete
cell for hours spanning multiple shift changes, and
tours of duty. Throughout the days and nights my
pleas for food, water, warmth and other basic humane
decencies fell upon deaf ears. These officers
negligently failed to exercise due care and
compassion for anothers humanity, or duly observe
their obligations to preserve my mental health
and hygene by restraining themselves, or another,
from doing any thing to me that would and or could
Cause me undue pain and suffering while I was in
their care and custody. These officers morally knew,
or should have known, that the treatment I was
receiving was cruel and inhumane, and instead of
making an attempt to stop it they willfully perpetuated
it. These officers were given power over my life

45 of 50

435 U.S. (1987) (quoting United States v. First Nat'l City Bank, 379 U.S. 378, 404 (1965) (Harlan, J., dissenting).

This narrow extension of the federal reach applies only if a claim is made against the defendant under federal law. It does not establish personal jurisdiction if the only claims are those arising under state law or the law of another country, even though there might be diversity or alienage subject matter jurisdiction as to such claims. If, however, personal jurisdiction is established under this paragraph with respect to a federal claim, then 28 U.S.C. § 1367(a) provides supplemental jurisdiction over related claims against that defendant, subject to the court's discretion to decline exercise of that jurisdiction under 28 U.S.C. § 1367(c).

**Subdivision (l).** This subdivision assembles in one place all the provisions of the present rule bearing on proof of service. No material change in the rule is effected. The provision that proof of service can be amended by leave of court is retained from the former subdivision (h). See generally 4A Wright & Miller, Federal Practice and Procedure § 1132 (2d ed. 1987).

**Subdivision (m).** This subdivision retains much of the language of the present subdivision (j).

The new subdivision explicitly provides that the court shall allow additional time if there is good cause for the plaintiff's failure to effect service in the prescribed 120 days, and authorizes the court to relieve a plaintiff of the consequences of an application of this subdivision even if there is no good cause shown. Such relief formerly was afforded in some cases, partly in reliance on Rule 6(b). Relief may be justified, for example, if the applicable statute of limitations would bar the refiled action, or if the defendant is evading service or conceals a defect in attempted service. E.g., Ditkof v. Owens-Illinois, Inc., 114 F.R.D. 104 (E.D.Mich.1987). A specific instance of good cause is set forth in paragraph (3) of this rule, which provides for extensions if necessary to correct oversights in compliance with the requirements of multiple service in actions against the United States or its officers, agencies, and corporations. The district court should also take care to protect pro se plaintiffs from consequences of confusion or delay attending the resolution of an in forma pauperis petition. Robinson v. America's Best Contacts & Eyeglasses, 876 F.2d 596 (7th Cr.1989).

The 1983 revision of this subdivision referred to the "party on whose behalf such service was required," rather than to the "plaintiff," a term used generically elsewhere in this rule to refer to any party initiating a claim against a person who is not a party to the action. To simplify the text, the revision returns to the usual practice in the rule of referring simply to the plaintiff even though its principles apply with equal force to defendants who may assert claims against non-parties under Rules 13(h), 14, 19, 20, or 21.

**Subdivision (n).** This subdivision provides for in rem and quasi-in-rem jurisdiction. Paragraph (1) incorporates any requirements of 28 U.S.C. § 1655 or similar provisions bearing on seizures or liens.

Paragraph (2) provides for other uses of quasi-in-rem jurisdiction but limits its use to exigent circumstances. Provisional remedies may be employed as a means to secure jurisdiction over the property of a defendant whose person is not within reach of the court, but occasions for the use of this provision should be rare, as where the defendant is a fugitive or assets are in imminent danger of disappearing. Until 1963, it was not possible under Rule 4 to assert jurisdiction in a federal court over the property of a defendant not personally served. The 1963 amendment to subdivision (e) authorized the use of state law procedures authorizing seizures of assets as a basis for jurisdiction. Given the liberal availability of long-arm jurisdiction, the exercise of power quasi-in-rem has become almost an anachronism. Circumstances too spare to affiliate the defendant to the forum state sufficiently to support long-arm jurisdiction over the defendant's person are also inadequate to support seizure of the defendant's assets fortuitously found within the state. Shaffer v. Heitner, 433 U.S. 186 (1977).

**2000 Amendment**

Paragraph (2)(B) is added to Rule 4(i) to require service on the United States when a United States officer or employee is sued in an individual capacity for acts or omissions

liberty, and fortune and chose to use that power
to abuse me, their actions were oppressive, malicious
in nature, and caused me undue pain, suffering,
anxiety, emotional distress. I was denied the fundamental rights and immunities secured by the 8th Amendment, therefore, these officers are wholly liable to me
for damages.

15. Various C.O. JOHN DOES' AMKC Intake:

NOTE: Claims against Various C.O. JOHN DOES
of AMKC Intake are identical and verbatim
to Claims against Various C.O. JOHN DOES of
OBCC Intake except for exposure to freezing
temperatures.

State of New York Liability for Denial of
Fundamentaly Inalienable Rights and Immunities
Secured by the Constitution.

The State of New York attempted to wrongfully
collect a debt from me for the alleged breach of a
Statute by way of a Sustained legal process against
me. On May 22, 2019 Hon: Evelyn J. LaPorte went on
record and recused the State, State Attorneys' tacitly
accepted this, She then Stated "This is a matter
for the United States," She then recused herself and

46 of 50

Sent it to PART-MISC. where it was subsequently terminated in my favor and Sealed during or about January 2020 (To the best of my Knowledge).

· Recuse = "To reluctantly admit a Conflict of interest".
· Conflict of Interest = "A Conflict between ones obligation to the public, and ones Self interest"
· Obligation = "Some Thing one must do because of a prior Contractual agreement".

When HON: Evelyn J. LaPorte did this She Conceded that Subject-Matter Jurisdiction was not possessed.
· Subject-Matter Jurisdiction = "The interest in the res".

The 10th Amendment exists to Secure my most fundamental inalienable birth right and immunity, my Sovereignty. The Constitution does not exist to give me rights, or privileges it exists to Secure that which rightfully belongs to me, "All Judges" are owing of an obligation (Article VI) to protect my interest. A "FACT" is only an Unrebutted legal presumption, the State Attorney brought the presumption of a "Statute Offense" into the Court, before the "Fact Finder" ℣ HON: Evelyn J. LaPorte.

47 of 50

Statute = "A Bond", Offense = "A Breach", the Sovereign can only be Sued where the Sovereign agreed to be Sued, in my Sovereign State I did not ratify the Statute that was alleged to have been offended. Therefore, the only facts to be found were;
· The State possessed no legal standing to come into the Court Seeking relief of any Kind, and
· There existed a Conflict of interest, absent written proof of a lawful conveyance.

Unlike the State, I come into the District Court Standing upon a written instrument that binds the State namely the Constitution and the 14th Amendment thereof. The State denied my fundamental inalienable rights and immunities secured by the 14th Amendment to the Constitution namely, Due Process, and Deprivation of Liberty.
· Due = "In good faith, Bona fide"
· Process = "A manner of doing which creates and or achieves Some Thing"
To ask, was Due Process afforded? is to pose the questions "Does a Contractual Agreement lawfully exist?", and "Is it lawfully binding upon the accused?" The language of the 14th Amendment makes it clear that malicious prosecutions by the State Shall not be tolerated. State Policy

48 of 50

Makers have permitted its Attorneys to adopt a
practiced pattern of abuse of prosecutorial immunity
and the State, and Counties which they represent, have
negligently failed to create and or maintain a proper
System for oversight to deter and punish those who
would engage, or those who have engaged, and those
who repeatedly engaged in prosecutorial misconduct
and or malicious prosecutions to prevent such
abuse. This malicious prosecution caused me
extensive irreparable damages, denied me
fundamental inalienable rights and immunities and
caused the infliction of undue physical, mental,
emotional, and psychological pain and sufferings
upon me for Fourty-Three (43) months of my life
before it was finally terminated along with the
legal action Stemming from it. Therefore the State
is wholly liable to me for damages.

Every incident stated herein caused me
undue pain and or mental, emotional, and
psychological suffering, some more then others, that
is still with me till this day. As a result of the
entire ordeal I still suffer from acute insomnia,
trouble staying asleep for meaningful amounts of
time to the point where im tired during work hours.
When I do get to sleep the Slightest sound jars me
awake, and at times I hyperventilate. I have

recurring flash backs when awake at times when I reading, watching t.v., or conversating and get depressed, and become reclusive when this happens. I have had feelings of inadequacy at times when I would previously have confidense, and it takes more then the average amount of stimulous to make me laugh, and when I do, I often get the feeling like I am taking life as a joke and become more serious to the point where I have been accused of becoming a buzz kill. My experience has took a toll on my social life because others I feel have no clue of what I endured, and will never fully understand me. This is just a brief discription of the irrepairable injuries caused, I have also suffered great losses as a result of the 43 month malicious prosecution and 16 months spent in forced deprivation of liberty namely, yet not limited too; Loss of time out of my life, Loss of time with my son, Loss of property, Loss of opportunity, loss of business infrastructure, Loss of Clientele, loss of profit, Loss of Reputation, Loss of private housing, Loss of All worldly possessions, Loss of identity, Loss of financial independence, Accrued Debt, etc.

50 of 50

replaces the rarely used former subdivision 4(h). See 4A Wright & Miller, Federal Practice and Procedure § 1131 (2d ed. 1987).

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ JUL 18 2022 ★

BROOKLYN OFFICE



**Subdivision (b).** Revised subdivision (b) replaces the former subdivision (a). The revised text makes clear that the responsibility for filling in the summons falls on the plaintiff, not the clerk of the court. If there are multiple defendants, the plaintiff may secure issuance of a summons for each defendant, or may serve copies of a single original bearing the names of multiple defendants if the addressee of the summons is effectively identified.

**Subdivision (c).** Paragraph (1) of revised subdivision (c) retains language from the former subdivision (d)(1). Paragraph (2) retains language from the former subdivision (a), and adds an appropriate caution regarding the time limit for service set forth in subdivision (m).

The 1983 revision of Rule 4 relieved the marshals' offices of much of the burden of serving the summons. Subdivision (c) eliminates the requirement for service by the marshal's office in actions in which the party seeking service is the United States. The United States, like other civil litigants, is now permitted to designate any person who is 18 years of age and not a party to serve its summons.

The court remains obligated to appoint a marshal, a deputy, or some other person to effect service of a summons in two classes of cases specified by statute: actions brought in forma pauperis or by a seaman. 28 U.S.C. §§ 1915, 1916. The court also retains discretion to appoint a process server on motion of a party. If a law enforcement presence appears to be necessary or advisable to keep the peace, the court should appoint a marshal or a deputy or other official person to make the service. The Department of Justice may also call upon the Marshals Service to perform services in actions brought by the United States. 28 U.S.C. § 651.

**Subdivision (d).** This text is new, but is substantially derived from the former subdivisions (c)(2)(C) and (D), added to the rule by Congress in 1983. The aims of the provision are to eliminate the costs of service of a summons on many parties and to foster cooperation among adversaries and counsel. The rule operates to impose upon the defendant those costs that could have been avoided if the defendant had cooperated reasonably in the manner prescribed. This device is useful in dealing with defendants who are furtive, who reside in places not easily reached by process servers, or who are outside the United States and can be served only at substantial and unnecessary expense. Illustratively, there is no useful purpose achieved by requiring a plaintiff to comply with all the formalities of service in a foreign country, including costs of translation, when suing a defendant manufacturer, fluent in English, whose products are widely distributed in the United States. See Bankston v. Toyota Motor Corp., 889 F.2d 172 (8th Cir.1989).

The former text described this process as service-by-mail. This language misled some plaintiffs into thinking that service could be effected by mail without the affirmative cooperation of the defendant. E.g., Gulley v. Mayo Foundation, 886 F.2d 161 (8th Cir.1989). It is more accurate to describe the communication sent to the defendant as a request for a waiver of formal service.

The request for waiver of service may be sent only to defendants subject to service under subdivision (e), (f), or (h). The United States is not expected to waive service for the reason that its mail receiving facilities are inadequate to assure that the notice is actually received by the correct person in the Department of Justice. The same principle is applied to agencies, corporations, and officers of the United States and to other governments and entities subject to service under subdivision (j). Moreover, there are policy reasons why governmental entities should not be confronted with the potential for bearing costs of service in cases in which they ultimately prevail. Infants or incompetent persons likewise are not called upon to waive service because, due to their presumed inability to understand the request and its consequences, they must generally be served through fiduciaries.

It was unclear whether the former rule authorized, mailing of a request for "acknowledgement of service" to defendants outside the forum state. See 1 R. Casad, Jurisdiction in Civil Actions (2d Ed.) 5-29, 30 (1991) and cases cited. But, as Professor Casad observed, there was no reason not to employ this device in an effort to obtain service outside the state, and there are many instances in which it was in fact so used, with respect both to defendants within the United States and to defendants in other countries.

territorial limits of the court's reach set forth in subdivision (k), including the constitutional limitations that may be imposed by the Due Process Clause of the Fifth Amendment.

Paragraph (1) authorizes service in any judicial district in conformity with state law. This paragraph sets forth the language of former subdivision (c)(2)(C)(i), which authorized the use of the law of the state in which the district court sits, but adds as an alternative the use of the law of the state in which the service is effected.

Paragraph (2) retains the text of the former subdivision (d)(1) and authorizes the use of the familiar methods of personal or abode service or service on an authorized agent in any judicial district.

To conform to these provisions, the former subdivision (e) bearing on proceedings against parties not found within the state is stricken. Likewise stricken is the first sentence of the former subdivision (f), which had restricted the authority of the federal process server to the state in which the district court sits.

**Subdivision (f).** This subdivision provides for service on individuals who are in a foreign country, replacing the former subdivision (i) that was added to Rule 4 in 1963. Reflecting the pattern of Rule 4 in incorporating state law limitations on the exercise of jurisdiction over persons, the former subdivision (i) limited service outside the United States to cases in which extraterritorial service was authorized by state or federal law. The new rule eliminates the requirement of explicit authorization. On occasion, service in a foreign country was held to be improper for lack of statutory authority. E.g., Martens v. Winder, 341 F.2d 197 (9th Cir.), cert. denied, 382 U.S. 937 (1965). This authority, however, was found to exist by implication. E.g., SEC v. VTR, Inc., 39 F.R.D. 19 (S.D.N.Y.1966). Given the substantial increase in the number of international transactions and events that are the subject of litigation in federal courts, it is appropriate to infer a general legislative authority to effect service on defendants in a foreign country.

A secondary effect of this provision for foreign service of a federal summons is to facilitate the use of federal long-arm law in actions brought to enforce the federal law against defendants who cannot be served under any state law but who can be constitutionally subjected to the jurisdiction of the federal court. Such a provision is set forth in paragraph (2) of subdivision (k) of this rule, applicable only to persons not subject to the territorial jurisdiction of any particular state.

Paragraph (1) gives effect to the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents, which entered into force for the United States on February 10, 1969. See 28 U.S.C.A., Fed.R.Civ.P. 4 (Supp.1986). This Convention is an important means of dealing with problems of service in a foreign country. See generally 1 B. Ristau, International Judicial Assistance §§ 4-1-1 to 4-5-2 (1990). Use of the Convention procedures, when available, is mandatory if documents must be transmitted abroad to effect service. See Volkswagenwerk Aktiengesellschaft v. Schlunk, 486 U.S. 694 (1988) (noting that voluntary use of these procedures may be desirable even when service could constitutionally be effected in another manner); J. Weis, The Federal Rules and the Hague Conventions: Concerns of Conformity and Comity, 50 U.Pitt.L.Rev. 903 (1989). Therefore, this paragraph provides that, when service is to be effected outside a judicial district of the United States, the methods of service appropriate under an applicable treaty shall be employed if available and if the treaty so requires.

The Hague Convention furnishes safeguards against the abridgment of rights of parties through inadequate notice. Article 15 provides for verification of actual notice or a demonstration that process was served by a method prescribed by the internal laws of the foreign state before a default judgment may be entered. Article 16 of the Convention also enables the judge to extend the time for appeal after judgment if the defendant shows a lack of adequate notice either to defend or to appeal the judgment, or has disclosed a prima facie case on the merits.

The Hague Convention does not specify a time within which a foreign country's Central Authority must effect service, but Article 15 does provide that alternate methods may be used if a Central Authority does not respond within six months. Generally, a Central Authority can be expected to respond much more quickly than that limit might permit, but there have been occasions when the signatory state was dilatory or refused to cooperate

sufficient cause not to shift the cost of service would exist, however, if the defendant did not receive the request or was insufficiently literate in English to understand it. It should be noted that the provisions for shifting the cost of service apply only if the plaintiff and the defendant are both located in the United States, and accordingly a foreign defendant need not show "good cause" for its failure to waive service.

Paragraph (3) extends the time for answer if, before being served with process, the defendant waives formal service. The extension is intended to serve as an inducement to waive service and to assure that a defendant will not gain any delay by declining to waive service and thereby causing the additional time needed to effect service. By waiving service, a defendant is not called upon to respond to the complaint until 60 days from the date the notice was sent to it--90 days if the notice was sent to a foreign country--rather than within the 20 day period from date of service specified in Rule 12.

Paragraph (4) clarifies the effective date of service when service is waived; the provision is needed to resolve an issue arising when applicable law requires service of process to toll the statute of limitations. E.g., Morse v. Elmira Country Club, 752 F.2d 35 (2d Cir.1984). Cf. Walker v. Armco Steel Corp., 446 U.S. 740 (1980).

The provisions in former subdivision (c)(2)(C)(ii) of this rule may have been misleading to some parties. Some plaintiffs, not reading the rule carefully, supposed that receipt by the defendant of the mailed complaint had the effect both of establishing the jurisdiction of the court over the defendant's person and of tolling the statute of limitations in actions in which service of the summons is required to toll the limitations period. The revised rule is clear that, if the waiver is not returned and filed, the limitations period under such a law is not tolled and the action will not otherwise proceed until formal service of process is effected.

Some state limitations laws may toll an otherwise applicable statute at the time when the defendant receives notice of the action. Nevertheless, the device of requested waiver of service is not suitable if a limitations period which is about to expire is not tolled by filing the action. Unless there is ample time, the plaintiff should proceed directly to the formal methods for service identified in subdivisions (e), (f), or (h).

The procedure of requesting waiver of service should also not be used if the time for service under subdivision (m) will expire before the date on which the waiver must be returned. While a plaintiff has been allowed additional time for service in that situation, e.g., Prather v. Raymond Constr. Co., 570 F.Supp. 278 (N.D.Ga.1983), the court could refuse a request for additional time unless the defendant appears to have evaded service pursuant to subdivision (e) or (h). It may be noted that the presumptive time limit for service under subdivision (m) does not apply to service in a foreign country.

Paragraph (5) is a cost-shifting provision retained from the former rule. The costs that may be imposed on the defendant could include, for example, the cost of the time of a process server required to make contact with a defendant residing in a guarded apartment house or residential development. The paragraph is explicit that the costs of enforcing the cost-shifting provision are themselves recoverable from a defendant who fails to return the waiver. In the absence of such a provision, the purpose of the rule would be frustrated by the cost of its enforcement, which is likely to be high in relation to the small benefit secured by the plaintiff.

Some plaintiffs may send a notice and request for waiver and, without waiting for return of the waiver, also proceed with efforts to effect formal service on the defendant. To discourage this practice, the cost-shifting provisions in paragraphs (2) and (5) are limited to costs of effecting service incurred after the time expires for the defendant to return the waiver. Moreover, by returning the waiver within the time allowed and before being served with process, a defendant receives the benefit of the longer period for responding to the complaint afforded for waivers under paragraph (3).

**Subdivision (e).** This subdivision replaces former subdivisions (c)(2)(C)(i) and (d)(1). It provides a means for service of summons on individuals within a judicial district of the United States. Together with subdivision (f), it provides for service on persons anywhere, subject to constitutional and statutory constraints.

Service of the summons under this subdivision does not conclusively establish the jurisdiction of the court over the person of the defendant. A defendant may assert the

governments subject to service pursuant to this subdivision.

The revision adds a new paragraph (1) referring to the statute governing service of a summons on a foreign state and its political subdivisions, agencies, and instrumentalities, the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. § 1608. The caption of the subdivision reflects that change.

**Subdivision (k)**. This subdivision replaces the former subdivision (f), with no change in the title. Paragraph (1) retains the substance of the former rule in explicitly authorizing the exercise of personal jurisdiction over persons who can be reached under state long-arm law, the "100-mile bulge" provision added in 1963, or the federal interpleader act. Paragraph (1)(D) is new, but merely calls attention to federal legislation that may provide for nationwide or even world-wide service of process in cases arising under particular federal laws. Congress has provided for nationwide service of process and full exercise of territorial jurisdiction by all district courts with respect to specified federal actions. See 1 R. Casad, Jurisdiction in Civil Actions (2d Ed.) chap. 5 (1991).

Paragraph (2) is new. It authorizes the exercise of territorial jurisdiction over the person of any defendant against whom is made a claim arising under any federal law if that person is subject to personal jurisdiction in no state. This addition is a companion to the amendments made in revised subdivisions (e) and (f).

This paragraph corrects a gap in the enforcement of federal law. Under the former rule, a problem was presented when the defendant was a non-resident of the United States having contacts with the United States sufficient to justify the application of United States law and to satisfy federal standards of forum selection, but having insufficient contact with any single state to support jurisdiction under state long-arm legislation or meet the requirements of the Fourteenth Amendment limitation on state court territorial jurisdiction. In such cases, the defendant was shielded from the enforcement of federal law by the fortuity of a favorable limitation on the power of state courts, which was incorporated into the federal practice by the former rule. In this respect, the revision responds to the suggestion of the Supreme Court made in Omni Capital Int'l. v. Rudolf Wolff & Co., Ltd., 484 U.S. 97, 111 (1987).

There remain constitutional limitations on the exercise of territorial jurisdiction by federal courts over persons outside the United States. These restrictions arise from the Fifth Amendment rather than from the Fourteenth Amendment, which limits state-court reach and which was incorporated into federal practice by the reference to state law in the text of the former subdivision (e) that is deleted by this revision. The Fifth Amendment requires that any defendant have affiliating contacts with the United States sufficient to justify the exercise of personal jurisdiction over that party. Cf. Wells Fargo & Co. v. Wells Fargo Express Co., 556 F.2d 406, 418 (9th Cir.1977). There also may be a further Fifth Amendment constraint in that a plaintiff's forum selection might be so inconvenient to a defendant that it would be a denial of "fair play and substantial justice" required by the due process clause, even though the defendant had significant affiliating contacts with the United States. See DeJames v. Magnificent Carriers, 654 F.2d 280, 286 n. 3 (3rd Cir.), cert. denied, 454 U.S. 1085 (1981). Compare World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 293-294 (1980); Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 702-03 (1982); Burger King Corp. v. Rudzewicz, 471 U.S. 462, 476-78 (1985); Asahi Metal Indus. v. Superior Court of Cal., Solano County, 480 U.S. 102, 108-13 (1987). See generally R. Lusardi, Nationwide Service of Process: Due Process Limitations on the Power of the Sovereign, 33 Vill.L.Rev. 1 (1988).

This provision does not affect the operation of federal venue legislation. See generally 28 U.S.C. § 1391. Nor does it affect the operation of federal law providing for the change of venue. 28 U.S.C. §§ 1404, 1406. The availability of transfer for fairness and convenience under § 1404 should preclude most conflicts between the full exercise of territorial jurisdiction permitted by this rule and the Fifth Amendment requirement of "fair play and substantial justice."

The district court should be especially scrupulous to protect aliens who reside in a foreign country from forum selections so onerous that injustice could result. "[G]reat care and reserve should be exercised when extending our notions of personal jurisdiction into the international field." Asahi Metal Indus. v. Superior Court of Cal., Solano County, 480 U.S.

opportunity for waiver has distinct advantages to a foreign defendant. By waiving service, the defendant can reduce the costs that may ultimately be taxed against it if unsuccessful in the lawsuit, including the sometimes substantial expense of translation that may be wholly unnecessary for defendants fluent in English. Moreover, a foreign defendant that waives service is afforded substantially more time to defend against the action than if it had been formally served: under Rule 12, a defendant ordinarily has only 20 days after service in which to file its answer or raise objections by motion, but by signing a waiver it is allowed 90 days after the date the request for waiver was mailed in which to submit its defenses. Because of the additional time needed for mailing and the unreliability of some foreign mail services, a period of 60 days (rather than the 30 days required for domestic transmissions) is provided for a return of a waiver sent to a foreign country.

It is hoped that, since transmission of the notice and waiver forms is a private nonjudicial act, does not purport to effect service, and is not accompanied by any summons or directive from a court, use of the procedure will not offend foreign sovereignties, even those that have withheld their assent to formal service by mail or have objected to the "service-by-mail" provisions of the former rule. Unless the addressee consents, receipt of the request under the revised rule does not give rise to any obligation to answer the lawsuit, does not provide a basis for default judgment, and does not suspend the statute of limitations in those states where the period continues to run until service. Nor are there any adverse consequences to a foreign defendant, since the provisions for shifting the expense of service to a defendant that declines to waive service apply only if the plaintiff and defendant are both located in the United States.

With respect to a defendant located in a foreign country like the United Kingdom, which accepts documents in English, whose Central Authority acts promptly in effecting service, and whose policies discourage its residents from waiving formal service, there will be little reason for a plaintiff to send the notice and request under subdivision (d) rather than use convention methods. On the other hand, the procedure offers significant potential benefits to a plaintiff when suing a defendant that, though fluent in English, is located in a country where, as a condition to formal service under a convention, documents must be translated into another language or where formal service will be otherwise costly or time-consuming.

Paragraph (1) is explicit that a timely waiver of service of a summons does not prejudice the right of a defendant to object by means of a motion authorized by Rule 12(b)(2) to the absence of jurisdiction over the defendant's person, or to assert other defenses that may be available. The only issues eliminated are those involving the sufficiency of the summons or the sufficiency of the method by which it is served.

Paragraph (2) states what the present rule implies: the defendant has a duty to avoid costs associated with the service of a summons not needed to inform the defendant regarding the commencement of an action. The text of the rule also sets forth the requirements for a Notice and Request for Waiver sufficient to put the cost-shifting provision in place. These requirements are illustrated in Forms 1A and 1B, which replace the former Form 18-A.

Paragraph (2)(A) is explicit that a request for waiver of service by a corporate defendant must be addressed to a person qualified to receive service. The general mail rooms of large organizations cannot be required to identify the appropriate individual recipient for an institutional summons.

Paragraph (2)(B) permits the use of alternatives to the United States mails in sending the Notice and Request. While private messenger services or electronic communications may be more expensive than the mail, they may be equally reliable and on occasion more convenient to the parties. Especially with respect to transmissions to foreign countries, alternative means may be desirable, for in some countries facsimile transmission is the most efficient and economical means of communication. If electronic means such as facsimile transmission are employed, the sender should maintain a record of the transmission to assure proof of transmission if receipt is denied, but a party receiving such a transmission has a duty to cooperate and cannot avoid liability for the resulting cost of formal service if the transmission is prevented at the point of receipt.

A defendant failing to comply with a request for waiver shall be given an opportunity to show good cause for the failure, but sufficient cause should be rare. It is not a good cause for failure to waive service that the claim is unjust or that the court lacks jurisdiction.

SUFFOLK COUNTY CORRECTIONAL FACILITY
110 CENTER DRIVE
RIVERHEAD, NY 11901

NAME: 768 190





1000                    11201

U.S.
FCM
LAURE
11948
JUL 16
AMOU
$0
R23039

CLERK OF U.S.

EASTERN DISTRI

225 CADM

BROOKLYN,

" LEGAL MAIL URGENT "

"INDIGENT"



POSTAGE PAID
S ENV
, NY

22
IT

0.00
101934-05

DISTRICT COURT

CT OF NEW YORK

AN PLAZA EAST

NY 11201

